# EXHIBIT A

|   |   |
|---|---|
| 1 | PAUL F. RUGANI (SBN 342647) |
|   | prugani@orrick.com |
| 2 | ORRICK, HERRINGTON & SUTCLIFFE LLP |
|   | 2050 Main Street, Suite 1100 |
| 3 | Irvine, CA 92614-8255 |
|   | Telephone: +1 949 567 6700 |
| 4 | Facsimile: +1 949 567 6710 |
| 5 | RICHARD JACOBSEN (admitted pro hac vice) |
|   | rjacobsen@orrick.com |
| 6 | ORRICK, HERRINGTON & SUTCLIFFE LLP |
|   | 51 West 52nd Street |
| 7 | New York, NY 10019-6142 |
|   | Telephone: +1 212 506 5000 |
| 8 | Facsimile: +1 212 506 5151 |
| 9 | CLEMENT S. ROBERTS (SBN 209203) |
|   | croberts@orrick.com |
| 10 | ORRICK, HERRINGTON & SUTCLIFFE LLP |
|   | The Orrick Building |
| 11 | 405 Howard Street |
|   | San Francisco, CA 94105-2669 |
| 12 | Telephone: +1 415 773 5700 |
|   | Facsimile: +1 415 773 5759 |
| 13 |   |
| 14 | Attorneys for Defendants |
|   | Honey Science, LLC and PayPal, Inc. |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| TOM CAMPBELL, DANIEL JENKS-BERRYMAN, DECLAN LYNN, ADITHYA NARAYANAN, JAMES POAD, DAN SORAHAN, ALAN SUTCH, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HONEY SCIENCE, LLC, a Delaware limited liability company, PAYPAL, INC., a Delaware corporation, and DOES 1 through 50,<br><br>Defendants. | Case No. 5:25-cv-02850-PCP<br><br>**DECLARATION OF SIMON WILLIS REGARDING ENGLISH LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**<br><br>Date: June 26, 2025<br>Time: 10:00 AM<br>Dept: Courtroom 8, 4th Floor<br>Judge: Hon. P. Casey Pitts |
|---|---|

I, Simon Willis, declare as follows:

**I.      BACKGROUND**

1.  Orrick represents Honey Science, LLC, and PayPal Inc. (together "**PayPal**") in *Campbell et al. v. Honey Science, LLC et al.*, Case No. 25-cv-2850, currently pending before the United States District Court for the Northern District of California. Plaintiffs in the litigation are U.K. citizens who allegedly downloaded PayPal's free Honey browser extension in the U.K. and used it to obtain discounts when shopping online in the U.K. Plaintiffs base their claims on statements made on Honey's website to the effect that Honey would "*find … the Internet's best discount codes,*" would "*find every working promo code online,*" and would "*apply the code with the biggest savings*" (the "**Website Statements**"). Plaintiffs allege the Website Statements created an "*implied contract*" that was breached when PayPal allegedly enabled its partner vendors "*to withhold the 'best' coupons or discount codes.*" Plaintiffs also allege the Website Statements, coupled with PayPal's agreements with merchants, violate California's Unfair Competition Law.

2.  Plaintiffs allege they provided their email addresses to PayPal as part of the process of installing and using the Honey browser extension. PayPal requires that users who register for an account with Honey in the U.K. agree to the Honey Terms of Use ("**TOU**"), which provide that the laws of England and Wales govern the TOU and the parties' relationship more broadly, which would include any disputes that may arise between users and PayPal. *See* Exhibit 2 to the Declaration of Julian Chan ("Ex. 2", the "**Chan Decl.**") at 12.

3.  I have been asked to provide my opinion on the principles of English contract law ("**English Law**") applicable to the issues summarized below which arise from the Plaintiffs' claims in the *Campbell* litigation as they are presently formulated. This declaration responds to the issues raised by the Plaintiffs in their Complaint and is not intended to be an exhaustive analysis of every provision of English statutory or common law that could arguably apply in this case.

4.  I am admitted to the roll as a solicitor of England and Wales and hold a current practicing certificate from the Solicitors Regulatory Authority. I graduated from the University of Birmingham with a L.L.B. in 1991 and passed the Law Society Final Examination at the College

of Law, Chester in 1992. I have practiced as a commercial litigator in the City of London for over thirty years. I trained at Biddle & Co between 1993 and 1995 when I qualified as a solicitor, and I remained at that firm until 1998. I joined Barlow Lyde & Gilbert in 1998 and was a partner at that firm from 2003 to 2008. I was a partner at Mayer Brown from 2008 to 2012 and I have been a partner at Orrick, Herrington & Sutcliffe (UK) LLP since 2012.

5. In providing this declaration, I have reviewed and rely on the Chan Decl., which sets forth the processes by which users access and download the Honey browser extension and sign up for a Honey account and which I assume Plaintiffs followed for purposes of this declaration.

6. According to the Chan Decl.:

   a. When a new user registers for a Honey account in the U.K., the user is prompted to complete a standardized registration process on Honey's website.

   b. First, the user downloads the Honey browser extension. Upon successfully downloading the extension, a screen appears giving the user the option to create an account through PayPal, Google, Apple, or by registering an email address.

   c. A user will only provide Honey an email address if they are signing up for an account.

   d. Regardless of which mechanism a user deploys to create an account, the final screen before completing registration includes a check box certifying that the user agrees to the following terms:

   *I have read and agree to the Honey Terms of Service and Privacy Policy. I understand that to continue, PayPal will share name and email address with Honey.*

   e. The TOU are hyperlinked directly adjacent to the check box.

   f. A new user cannot register an account without agreeing to the TOU at the time of sign up. *See* Chan Decl. ¶¶ 9-11.

II. **THE ENGLISH LAW ISSUES**

7. The TOU applicable to U.K. users provide that they are governed by the laws of England and Wales. I have been asked to confirm the relevant principles of English law as they apply to the following issues.

    a. Whether Plaintiffs' agreement to the TOU as part of the account creation process gave rise to a binding and enforceable contract between Plaintiffs and Honey incorporating the TOU.

    b. Whether the Website Statements created an "implied contract" between Honey and the Plaintiffs.

    c. Whether the Website Statements can take effect as an implied term in the contract between the Plaintiffs and Honey.

    d. How damages for breach of contract are calculated as a matter of English law.

III. **DID PLAINTIFFS' AGREEMENT TO THE TOU CREATE A BINDING CONTRACT INCORPORATING THE TOU?**

8. It is a well-established principle of English law that, provided a supplier does what is reasonably sufficient in the circumstances to give the customer notice of the terms and conditions of the agreement that the supplier offers to the customer before the customer agrees to the contract, then those terms and conditions will be incorporated into the contract between them. What constitutes reasonable notice will depend upon the circumstances and the nature of the clause to be included in the contract. If a clause in the supplier's terms and conditions is particularly onerous or unusual it will require greater notice than a standard clause.[1]

9. Presentation of standard terms published on a website during an enrolment process where the customer must check a box acknowledging agreement to those terms is generally referred to as a "click-wrap" process. The principle that terms and conditions may be validly incorporated into a contract concluded online using a "click-wrap" process has been confirmed in a number of

---

[1] *J Spurling Ltd v Bradshaw* [1956] EWCA Civ 3

English cases[2] and was recently considered by the Court of Appeal in *Parker-Grennan v Camelot UK Lotteries Ltd*.[3] The facts of that case are as follows.

10. At the relevant time Camelot was operator of the U.K. National Lottery. In 2015, Joan Parker-Grennan thought she had won £1 million in an online game because certain numbers displayed on her screen corresponded to the £1 million jackpot prize. Mrs Parker-Grennan took a screenshot but when she clicked the "Finish" button to claim her prize, she was notified that she had only won £10.

11. At the time of signing up to the website, players agreed to the relevant terms and conditions by ticking a box confirming that they had read and agreed to be bound by several sets of applicable terms (relating to different services provided by Camelot), which were accessible by either drop down menu or hyperlink. Those terms and conditions provided in relevant part that:

   a. Camelot could declare a Play invalid if the outcome as displayed on the screen did not match the result as predetermined by the computer system.

   b. Camelot's decision about whether or not a Play is a Winning Play, or in relation to any other matter or dispute arising from the payment or non-payment of Prizes, would be final and binding provided that it is reasonable.

12. Camelot maintained that the display issues, which had caused the £1 million prize to be displayed, were caused by a coding error in its software. It relied on the provisions of its terms and conditions which provided that Camelot's decision about whether or not a Play is a Winning Play, or in relation to any other matter or dispute arising from the payment or non-payment of Prizes, is final and binding, to declare that Mrs. Parker-Grennan's win of £1 million was defective.

13. The Court of Appeal agreed with the trial judge's finding that the relevant terms and conditions were incorporated and could be relied upon by Camelot.

---

[2] Maersk *GuinÉ-Bissau, Sarl (also known as "Maersk Guinea-Bissau Sarl" or "Maersk Guinee-Bissau Sarl"), Maersk A/S v Almar-Hum Bubacar BaldÉ S.A.R.L.* [2024] EWHC 993 (Comm); *Ebury Partners Belgium SA/NV v Technical Touch BV, Jan Berthels* [2022] EWHC 2927 (Comm)

[3] [2024] EWCA Civ 185;

14. In coming to its decision, the Court of Appeal confirmed that the relevant English law test was whether the supplier of the service has done "*what was reasonably sufficient to bring the various Terms and Conditions to the notice*" of the user.[4]  In particular:

   a. The relevant terms were not particularly onerous or unusual, and therefore no special attention needed to be drawn to them.

   b. As to the length of the terms (which in this case was significant), the Court took the view that this was not necessarily an issue, provided that consumers had the opportunity to read them before entering into the contract.

   c. Camelot had taken reasonable steps to make the terms easily accessible via hyperlinks and drop-down menus, which were displayed with sufficient prominence, and had given Mrs. Parker-Grennan enough time to review them.

15. The Court of Appeal in *Parker-Grennan* confirmed that the relevant question is not whether the trader has done "*everything in its power to try to make the other contracting party read the terms.*"  It acknowledged that in practice "[o]*ne cannot force someone to read the terms and conditions if they cannot be troubled to do so.*"  The trader only needs to take reasonable steps to bring the terms and conditions to the attention of the customer, which necessarily involves giving them a "*sufficient opportunity to read them*".  Depending on the facts and circumstances of the particular case, a sufficient opportunity may be afforded by "*providing a hyperlink to the terms or a drop-down menu which the consumer can click (or not) as they choose*".  In the circumstances of *Parker-Grennan*, enough had been done to incorporate Camelot's terms and conditions into the contract between Camelot and the Appellant.

16. The Court endorsed the click-wrap approach used by Camelot and rejected the argument that Camelot should have forced consumers to scroll through the terms before allowing them to click "I agree."

---

[4] *See also Impala Warehousing and Logistics (Shanghai) Co. Ltd v Wanxiang Resources (Singapore) PTE Ltd* [2015] EWHC 25 (Comm); *Blu-Sky Solutions Limited v Be Caring Limited* [2021] EWHC 2619 (Comm); *BDW Trading Limited v Lantoom Limited* [2023] EWHC 183 (TCC)

17. The Court of Appeal recognized that there may be circumstances in which a click-wrap agreement would be insufficient to draw the counterparty's attention to the terms and conditions. These included where the terms were on a website that remained open for such a short period of time that the consumer would not have had enough time to both digest the terms and complete the transaction. It also considered that the terms and conditions would not have been properly incorporated into a contract where the consumer had to click on many different hyperlinks in order to find the relevant terms, such that they were not readily or easily accessible.

18. Based on the description in the Chan Decl. of the process by which users sign up for a Honey account and confirm their agreement to Honey's TOU, the Honey click-wrap process appears to be substantially similar to the one which was found to be an effective method of incorporating terms and conditions in *Parker-Grennan*. I do not consider that there are circumstances here which indicate that the click-wrap process undertaken would be insufficient to incorporate the TOU into the Contract between Plaintiffs and Honey. In my opinion, an English court would not consider the relevant provisions of the TOU to be onerous or unusual and would therefore find that the Honey registration click-wrap process is sufficient to create a contract incorporating the TOU with users in the position of the Plaintiffs who register for Honey accounts.

### IV. WHETHER THE WEBSITE STATEMENTS CREATED AN "IMPLIED CONTRACT" BETWEEN HONEY AND THE PLAINTIFFS.

19. Plaintiffs allege that the Website Statements gave rise to an "*implied contract*" between Plaintiffs and PayPal governing the terms and conditions on which the Honey browser extension will present Plaintiffs with coupon offers. Specifically, Plaintiffs allege the terms of the implied contract were that "[w]*henever a Honey user activates the Honey browser extension when making a purchase, PayPal will cause the Honey browser extension to automatically search the Internet for the 'best' coupons and discount codes, and will apply them to the Honey user's purchase to provide the Honey user with the lowest possible price – ' ... the best one ...' – to obtain for the Honey user, "... the biggest savings ...*" FAC ¶ 48.

20. As a matter of English law, the question whether a contract was created by the Website Statements must be answered by consideration of the usual requirements of offer, acceptance, consideration, intention to create legal relations and certainty of terms. A contract is created (or not) by applying those principes. An "implied contract" is simply a contract where there is no express agreement (written or oral), and it is alleged that such an agreement should be implied from the parties' conduct.

21. By alleging an "implied contract", my understanding is that Plaintiffs allege that the Website Statements should be considered an "offer" which Plaintiffs then accepted by downloading the Honey browser extension and/or signing up for Honey. Under English law, the display of an object or service terms is not usually an offer to sell but an invitation to negotiate or "invitation to treat" (i.e. an indication by the seller that they may be prepared to enter into a contract with the buyer). Advertisements intended to lead to the making of bilateral contracts tend to be regarded under English law as invitations to treat.[5] One of the reasons for that conclusion is that advertisements usually lead to agreement of more detailed terms. However, if the advertiser's intention to be bound immediately upon the user accessing the service is sufficiently clear then the advertisement may be considered an offer. The question is whether, in all the circumstances of this case, the objective intention of the parties was to create a binding legal obligation incorporating the terms of the Website Statements.

22. To determine whether a pre-contractual statement has contractual effect, the English courts have applied the five principles which were identified in *The Inntrepreneur Pub Company (GL) v East Crown Limited*[6] 2000 (the "**Inntrepreneur Principles**")[7]:

---

[5] See *Chitty on Contracts, 35th Edition,* 4-019 and the cases cited therein. See, for example, *Partridge v Crittenden* [1968] 1 W.L.R. 1204 and *LNT Aviation Ltd v Airbus Helicopters UK Ltd* [2022] EWHC 309 (Comm)

[6] *[2000] 2 Lloyd's Rep. 611*

[7] These principles were applied by the Court of Appeal in *Business Environment Bow Lane Ltd v Deanwater Estates Limited* [2007] EWCA Civ 622 and *Colin Hanoman v Mayor and Burgesses of the London Borough of Southwark* [2008] EWCA Civ 624

DECLARATION OF SIMON WILLIS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
5:25-CV-02850-PCP

*"(1) a pre-contractual statement will only be treated as having contractual effect if the evidence shows that parties intended this to be the case. Intention is a question of fact to be decided by looking at the totality of the evidence;*

*(2) the test is the ordinary objective test for the formation of a contract: what is relevant is not the subjective thought of one party but what a reasonable outside observer would infer from all the circumstances;*

*(3) in deciding the question of intention, one important consideration will be whether the statement is followed by further negotiations and a written contract not containing any term corresponding to the statement. In such a case, it will be harder to infer that the statement was intended to have contractual effect because the prima facie assumption will be that the written contract includes all the terms the parties wanted to be binding between them;*

*(4) a further important factor will be the lapse of time between the statement and the making of the formal contract. The longer the interval, the greater the presumption must be that the parties did not intend the statement to have contractual effect in relation to a subsequent deal;*

*(5) a representation of fact is much more likely intended to have contractual effect than a statement of future fact or a future forecast."*

23. It follows from the Inntrepreneur Principles that the question of whether Website Statements were intended as an offer or merely an invitation to treat must be answered by looking at the totality of the joining process.

24. On the facts of this case, it was evident from the screen presented to the Plaintiffs before downloading the browser extension that there were overarching terms and conditions relating to the service. That same webpage informs the user that "*[b]y using the PayPal Honey browser extension, you agree to Honey's terms and conditions. (https://www.joinhoney.com/terms).*"

25. By completing their registration including a check box requiring the user to confirm the agreement to the TOU, the Plaintiffs entered into a subsequent agreement incorporating the

TOU. The TOU contain certain provisions which do not correspond to the Website Statements (as interpreted by the Plaintiffs). The TOU provide as follows:

a. *"While we try and find you the best available discounts and coupons, and to identify low prices, we may not always find you the best deal. PayPal is not responsible for any missed savings or rewards opportunities.* Ex. 2 at 2.

b. *Offers, coupons, and discount codes are provided subject to availability. Exclusions, restrictions, and terms and conditions (including third-party merchant exclusions, restrictions, and terms and conditions) may apply. Deals change often, and due to this, your application of offers, coupons and discount codes at checkout may or may not result in savings for your order.* Ex. 2 at 2.

c. *PayPal does not promise or guarantee that the product details, prices, coupon availability or other service terms, rates or rewards offered by any particular advertiser or other third party via our Service are the best prices, best terms or lowest rates available in the market.*" Ex. 2 at 2.

26. Applying the Inntrepreneur Principles, the fact that the Website Statements were followed by further interactions resulting in a contract <u>not</u> including a corresponding term is prima facie evidence that the parties did not intend the Website Statements to have contractual effect, and they were invitations to treat rather than offers to contract on those terms. In my opinion, an English court looking at the Website Statements, in the context of the process by which Plaintiffs sign up to use Honey, would conclude that the parties did <u>not</u> intend the Website Statements to have contractual effect.

27. While the Plaintiffs have not framed their Complaint by reference to English law, an alternative interpretation of their "implied contract" argument is that the Plaintiffs are alleging a term corresponding to the Website Statements should be implied as a matter of fact into the contract between Plaintiffs and Honey which was created by Plaintiffs' assent to the TOU via check box process. I consider the English law position regarding implied terms in the following section.

## V. WHETHER WEBSITE STATEMENTS CAN TAKE EFFECT AS AN IMPLIED TERM IN THE CONTRACT BETWEEN THE PLAINTIFFS AND HONEY

28. An English court may imply a term into a contract as a matter of fact to reflect the parties' intentions when the contract was entered into. In doing so, the court will consider what a reasonable person would have understood the parties' intentions to be, given the background knowledge reasonably available to the parties at the time they entered the contract.[8]

29. It has been described as a "cardinal rule" of English law that no term can be implied into a contract if it contradicts an express term. In the leading case of *Marks and Spencer plc v BNP Paribas Securities Services Trust Company (Jersey) Ltd and another* [2015] UKSC 72, the Supreme Court affirmed the decision of the Privy Council in *B.P. Refinery (Westernport) Proprietary Limited v Shire of Hastings (Victoria)* [1977] UKPC 13 (27 July 1977), including the following test for whether a term could be implied into a contract:

> *"[F]or a term to be implied, the following conditions (which may overlap) must be satisfied: (1) it must be reasonable and equitable; (2) it must be necessary to give business efficacy to the contract, so that no term will be implied if the contract is effective without it; (3) it must be so obvious that 'it goes without saying'; (4) it must be capable of clear expression; (5) <u>it must not contradict any express term of the contract</u>.*" (Emphasis added).

30. The test as set out in *Marks and Spencer* continues to be followed; it was cited with approval by the Supreme Court in *Barton v Morris , Gwyn-Jones (Deceased)* [2023] UKSC 3, and recently in the case of *Standard Chartered Plc v Guaranty Nominees Limited, D E Shaw Galvanic Portfolios Llc, Olifant Fund Ltd., FFI Fund Ltd., FYI Ltd.* [2024] EWHC 2605 (Comm).

31. Here, the alleged term on which the Plaintiffs rely, that PayPal will provide the "best" price and enable the "biggest" savings, could not take effect as an implied term as a matter of English law because it is contradicted by the parties' express agreement to be bound by the TOU. The TOU provide that "*PayPal does not promise or guarantee that the product details, prices,*

---

[8] *Marks and Spencer plc v BNP Paribas Securities Services Trust Company (Jersey) Ltd and another* [2015] UKSC 72

- 10 -   DECLARATION OF SIMON WILLIS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
5:25-CV-02850-PCP

*coupon availability or other service terms, rates or rewards offered by any particular advertiser or other third party via our Service are the best prices, best terms or lowest rates available in the market,*" that PayPal "*may not always find you the best deal,*" and "*PayPal is not responsible for any missed savings or rewards opportunities.*"

32.  In my opinion, the Website Statements on which Plaintiffs seek to rely would not be implied as a term into the agreement with PayPal as a matter of fact because they contradict the express terms of the agreement and break the cardinal rule identified in *Marks and Spencer*.

## VI. DAMAGES FOR BREACH OF CONTRACT

33.  The objective of an award of damages for breach of contract in English law is to place the Plaintiffs in the same position as if the contract had been properly performed.[9] Applying these principles here, if the Website Statements were contractual terms, in order to prove loss and damage in the manner suggested by the Complaint, Plaintiffs would need to demonstrate that for the purchases which they made while the Honey browser extension was active, Honey did not find the best discount coupon codes or apply the biggest savings available. The Plaintiffs' loss would be the difference in value between the savings which they achieved in fact and the savings which they would have achieved had Honey found the best codes or applied the best savings.

## VII. CONCLUSIONS

For the reasons given above, in my opinion the conclusions that would be reached in relation to the issues identified in Section II above as a matter of English law are as follows:

    a.    By requiring Plaintiffs' agreement to the TOU as part of the account creation process using the click-wrap method as described in the Chan Decl., Honey did what was reasonably sufficient to bring the TOU to the notice of Plaintiffs and the joining process therefore gave rise to a binding and enforceable contract between Plaintiffs and Honey incorporating the TOU.

---

[9] *Robinson v Harman* (1848) 1 Ex 850

- 11 -     DECLARATION OF SIMON WILLIS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
5:25-CV-02850-PCP


*coupon availability or other service terms, rates or rewards offered by any particular advertiser or other third party via our Service are the best prices, best terms or lowest rates available in the market,*" that PayPal "*may not always find you the best deal,*" and "*PayPal is not responsible for any missed savings or rewards opportunities.*"

32.  In my opinion, the Website Statements on which Plaintiffs seek to rely would not be implied as a term into the agreement with PayPal as a matter of fact because they contradict the express terms of the agreement and break the cardinal rule identified in *Marks and Spencer*.

## VI. DAMAGES FOR BREACH OF CONTRACT

33.  The objective of an award of damages for breach of contract in English law is to place the Plaintiffs in the same position as if the contract had been properly performed.[9] Applying these principles here, if the Website Statements were contractual terms, in order to prove loss and damage in the manner suggested by the Complaint, Plaintiffs would need to demonstrate that for the purchases which they made while the Honey browser extension was active, Honey did not find the best discount coupon codes or apply the biggest savings available. The Plaintiffs' loss would be the difference in value between the savings which they achieved in fact and the savings which they would have achieved had Honey found the best codes or applied the best savings.

## VII. CONCLUSIONS

For the reasons given above, in my opinion the conclusions that would be reached in relation to the issues identified in Section II above as a matter of English law are as follows:

    a.    By requiring Plaintiffs' agreement to the TOU as part of the account creation process using the click-wrap method as described in the Chan Decl., Honey did what was reasonably sufficient to bring the TOU to the notice of Plaintiffs and the joining process therefore gave rise to a binding and enforceable contract between Plaintiffs and Honey incorporating the TOU.

---

[9] *Robinson v Harman* (1848) 1 Ex 850

      b.    The Website Statements did not create an "implied contract" between Honey and the Plaintiffs in circumstances where they were followed by a written contract containing an express term encompassing the same subject matter as the Website Statements.

      c.    The Website Statements cannot take effect as an implied term in the contract between the Plaintiffs and Honey in circumstances where they are contradicted by an express term of that contract.

      d.    To prove that a recoverable loss had been suffered, Plaintiffs would need to establish that Honey did not find the best discount coupon codes or apply the biggest savings.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed April 16, 2025 in London, United Kingdom.

Dated: April 16, 2025

By: _____
           Simon Willis

- 12 -

DECLARATION OF SIMON WILLIS IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS
5:25-CV-02850